# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                            **Case No. 07-CR-330**

**JON HANSON**
        **Defendant.**

## SENTENCING MEMORANDUM

The government charged defendant Jon Hanson with transporting and possessing child pornography, contrary to 18 U.S.C. §§ 2252A(a)(1) & (a)(5)(B), and he entered a plea of guilty to the transporting charge, which carries a statutory penalty range of 5 to 20 years. However, due to the numerous enhancements he faced, the sentencing guidelines recommended that defendant spend 210-262 months in prison. Because I found this range far greater than necessary to satisfy the purposes of sentencing in this case, I imposed a non-guideline sentence of 72 months, followed by life of supervised release. This memorandum sets forth the reasons for the sentence imposed.

**I.**

In imposing sentence, the district court must first correctly calculate the advisory guideline range, then select an appropriate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007); see also Gall v. United States, 128 S. Ct. 586, 596 (2007). In the present case, defendant's pre-sentence report ("PSR") recommended a base offense level of 22, U.S.S.G. § 2G2.2(a)(2), plus 2 because the material involved a prepubescent minor or a minor who had not attained the age

of 12 years, § 2G2.2(b)(2), plus 5 because defendant distributed the material for a "thing of value" (i.e., other child pornography), § 2G2.2(b)(3)(B) & cmt. n.1, plus 4 because the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, § 2G2.2(b)(4), plus 2 because the offense involved the use of a computer, § 2G2.2(b)(6), and plus 5 because the offense involved 600 or more images, § 2G2.2(b)(7)(D). Following a 3 level reduction for acceptance of responsibility and coupled with a criminal history category of I, the PSR recommended a final guideline range of 210-262 months. I found these calculations correct and adopted them without objection. I turned then to the § 3553(a) factors.

**II.**

In imposing the ultimate sentence, the district court must consider all of the factors set forth in § 3553(a). United States v. Harris, 490 F.3d 589, 593 (7th Cir. 2007), cert. denied, 128 S. Ct. 963 (2008). Those factors include:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the advisory guideline range;

(5)  any pertinent policy statements issued by the Sentencing Commission;

(6)    the need to avoid unwarranted sentence disparities; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the court must impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public and rehabilitation of the defendant. § 3553(a)(2). This so-called "parsimony provision" represents the "overarching" command of the statute. Kimbrough v. United States, 128 S. Ct. 558, 570 (2007).

The district court must give respectful consideration to the guidelines in determining a sufficient sentence, Gall, 128 S. Ct. at 594, but it may not presume that the guideline sentence is the correct one, Rita v. United States, 127 S. Ct. 2456, 2465 (2007), or place "any thumb on the scale favoring a guideline sentence." United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007); see also United States v. Carter, No. 06-2412, slip op. at 23-24 (7th Cir. June 20, 2008) (stating that the guidelines "are but one factor among those listed in 18 U.S.C. § 3553(a)"); United States v. Demaree, 459 F.3d 791, 794-95 (7th Cir. 2006), cert. denied, 127 S. Ct. 3055 (2007) (stating that while § 3553(a)(4) "nudges" the court towards the guideline range, the court's "freedom to impose a reasonable sentence outside the range is unfettered"). The court is free to consider whether the guideline sentence itself "fails properly to reflect § 3553(a) considerations" in the case at hand, Rita, 127 S. Ct. at 2465, and/or whether the guideline at issue exemplifies the Sentencing Commission's "exercise of its characteristic institutional role." Kimbrough, 128 S. Ct. at 575.

**III.**

Defendant participated in a peer-to-peer file sharing program known as "Hello!" A user connected to this program can trade image files, chat in real time, and send and receive folders

3

of image files. The user is required to create a user name, or "handle," and supply an e-mail address and password. The program also sets up file directories, including an archive for images shared.

An investigation by Immigration and Customs Enforcement ("ICE") of a user of Hello from Cleveland known as "M.J." led to defendant Hanson, who used the screen-name "Starmale1959." A forensic examination of M.J.'s computer revealed that during conversations between the two on January 18, 2006, M.J. and defendant traded hundreds of image files, which included child pornography.

ICE Agents learned defendant's physical location via Google, then executed a search warrant at his house in December 2006, recovering a Compaq computer containing child pornography, as well as CDs containing such material. Defendant made a statement to agents and agreed to take them to his workplace, where agents seized a Dell laptop that also contained illegal images, as well as an additional CD containing this material. Defendant used the office computer for the January 18, 2006 sharing with M.J., which formed the basis for the count of conviction. According to the ICE agent, the Compaq contained about 132 images, the Dell 161 images, and the five CDs about 100 each. The Center for Missing and Exploited Children was able to identify twenty-six known victims out of the images found on the computers. Some of the images depicted children under the age of twelve and at least one contained violent imagery, i.e. a child assaulted while bound.

As everyone (including defendant) acknowledged, the crime was very serious. Young children are harmed to create this material, which is used to feed a market composed of those with the predilections defendant had. Defendant possessed a significant number of images, and as the government noted at sentencing, his chats with M.J. included vile comments about

4

the children depicted. Congress has signaled its view of the seriousness of the crime by creating a statutory range of 5-20 years. Ultimately, I had to decide where in that range this defendant fell.

In making this determination, I also had to consider defendant's character and background, which was otherwise quite positive. Forty-nine years old, he had no prior record whatsoever. He grew up in an intact home, where his needs were met. He graduated high school, received an associate's degree in funeral science, and held a funeral director's license and operated a funeral home for over twenty years, taking over the business from his father. He appeared to have been a successful and well-respected businessman.

However, as often seems to be the case for this type of offender, defendant reported sexual abuse by an older relative when he was ten years old. This relative forced him and other children to engage in sex acts, which he photographed. This relative also exposed him to pornography. Defendant received no therapy or other help at the time in dealing with these experiences, which shaped his sexual development. Defendant also developed a serious problem with alcohol, reporting that for years prior to his arrest he drank about a fifth of vodka every day.

Defendant married in 1983, but the marriage ended in divorce – based on this case apparently – in 2007. Defendant and his ex-wife had three children, all young adults, and he appeared to have a solid relationship with them. Defendant suffered other severe collateral consequences as a result of the arrest, including the loss of his funeral director license and the sale of the family funeral home business. As a result of his unemployment, he was unable to assist his children financially with their education. After the divorce and sale of the family home, defendant moved in with his parents, where he lived up until sentencing.

5

Following his arrest in this case, defendant made significant, positive changes in his life, regularly attending Alcoholic's Anonymous ("AA") meetings, generally six days per week. All drug and alcohol screens on pre-trial release were negative. For someone with defendant's heavy use of alcohol, I found this a significant accomplishment. Defendant also received treatment for depression, with medication that seemed to be helping him. Most significantly, shortly after his arrest and before indictment, defendant voluntarily started sex offender treatment with Dr. Michael Kotkin, who submitted a detailed report on defendant's progress.

Dr. Kotkin indicated that defendant consistently attended group and individual sessions, demonstrated good insight into his problems, and seemed committed to avoiding child pornography. Dr. Kotkin stated that defendant's prognosis was quite good given the positive changes he had made in his life. As to why defendant involved himself in this offense, Dr. Koptkin explained that defendant's exposure to sexual abuse and pornography as a boy established a trend, making pornography acceptable. Dr. Kotkin stated that it is not uncommon for someone exposed to this material so early to become addicted to it as they get older, and explained that defendant became involved with child pornography after a long history of viewing adult pornography. Dr. Kotkin indicated that there was no evidence to suggest (and he did not believe) that defendant ever actually abused a child, something that is always a concern in these types of cases, and he did not label defendant a pedophile. (PSR ¶¶ 64-66.)

The other evidence in the record supported Dr. Kotkin's assessment in this regard. After defendant's arrest, police interviewed defendant's children and neighbors and uncovered no evidence of inappropriate contact. Defendant submitted letters from friends and family, which likewise indicated that defendant engaged in no inappropriate contact with those around him, including children. The letters further indicated that there remained much good will towards the

6

defendant, notwithstanding his arrest for this offense. In fact, friends of his children continued to view him as a father figure. Given the social opprobrium affixed to this type of crime, I found the sentiments expressed in the letters rather extraordinary.

As indicated above, the guidelines called for a term of 210-262 months in prison. Under the circumstances of this case, I found that range greater than necessary to satisfy the purposes of sentencing.

First, the guideline for this offense, which contains numerous and significant enhancements for factors that are present in many if not most cases, diverges significantly from the Sentencing Commission's typical, empirical approach, and produced a sentence greater than necessary to provide just punishment in this case. See 18 U.S.C. § 3553(a)(2)(A). As defendant noted in his sentencing memorandum, the enhancements for use of a computer and images containing children under age twelve are typical of this crime. Further, given the unfortunate ease of access to this type of material in the computer age, compiling a collection with hundreds of images is all too easy, yet carries a 5 level enhancement, which in this case nearly doubled the range. The guideline also carries a 5 level enhancement for trading images for a "thing of value," U.S.S.G. § 2G2.2(b)(3)(B), which may, as in this case, mean other images of child pornography, U.S.S.G. § 2G2.2 cmt. n.1. This case in no way involved commercial activity or profit from these types of images, yet the guideline imposed on defendant the same degree of enhancement as may be imposed on a commercial peddler. See U.S.S.G. § 2G2.2(b)(3)(A). The other large enhancement defendant received – 4 levels for a portrayal of sadistic conduct – applies whether or not the person specifically intended to possess such material, see U.S.S.G. § 2G2.2 cmt. n.2, which seems an odd way of measuring culpability. Defendant denied seeking out such material, and nothing in the record controverted

7

his denial. To the extent that harsh punishment is necessary in these types of cases to reduce the demand for material that results in harm to children, a defendant who does not seek out the worst of that material should not receive the same sentence as someone who does.

In a recent paper published on Professor Douglas Berman's sentencing website, an Assistant Federal Defender traced the history of this guideline and pointed out its serious flaws, which were clearly evident in this case. See Troy Sabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines, available at http://sentencing.typepad.com (June 10, 2008). As Stabenow explains, much like the crack guideline criticized by the Supreme Court in Kimbrough, guideline 2G2.2 is not representative of the Commission's typical role or of empirical study. The guideline has been steadily increased despite evidence and recommendations by the Commission to the contrary. Congress has repeatedly amended it directly, ostensibly to target mass producers of child pornography and/or repeat abusers of children, a class of offenders that make up less than 5% of those affected by the changes. The most recent changes from 2003 apparently came from two lawyers in the Justice Department who persuaded a novice Congressman to add them to the popular Amber Alert bill. Id. at 27. To the extent that the advisory guidelines deserve continued respect from courts, that respect will be greatest where the Commission has satisfied its institutional role of relying on evidence and study to develop sound sentencing practices. This guideline simply does not represent that role, as the Commission itself has acknowledged.

Between 1994 and 2007, the mean sentence in child pornography cases increased from 36 months to 110 months. Id. at 1. As Stabenow notes, this increase was not the result of the empirical approach often used by the Commission, designed to be an expert body on sentencing. Rather, it was the result of arbitrary increases by Congress slipped into other bills,

8

often with little or no debate, resulting in direct amendments to the guidelines. Id. at 2. These amendments destroyed some of the careful distinctions the Commission had drawn between true peddlers of child pornography and more simple possessors or transporters. To its credit, and as in the crack cocaine context, the Commission sought to persuade Congress not make such changes, but to no avail. Id. at 3-7 (quoting letter from Chair of the Commission). Specifically, the Commission has noted that the enhancement for use of a computer does not make much sense because online pornography comes from the same pool of images found in specialty magazines or adult bookstores. Further, to the extent that use of a computer may aggravate an offense, it does not do so in every case. For example, someone who e-mails images to another (like the instant defendant) is not as culpable as someone who sets up a website to distribute child pornography to a large number of subscribers. If the defendant did not use the computer to widely disseminate the images, use them to entice a child, or show them to a child, the purpose for the enhancement is not served. Id. at 14-15. Yet it applies in virtually all cases.

The Commission itself sought to increase penalties for those offenders who also had a history of sexually exploiting or abusing minors, and posed a greater risk of recidivism, certainly a valid concern. However, Stabenow notes that it did so based on a study of offenders in 1994 and 1995, while most offenders prosecuted in federal court today, such as defendant Hanson, have no such histories. The typical child pornography defendant today has no prior felonies of any kind, let alone prior abuse of children, and is not involved in production. Id. at 13.

Finally, in 2003, as part of the Feeney Amendment to the PROTECT Act, Congress added the 5 level enhancement for number of images. No research, study or rationale was

9

provided for this huge increase. At the same time, Congress established the 5 year mandatory minimum applicable in this case, as a result of which the Commission also increased the base offense level to 22 to keep pace. Again, this had nothing to do with the Commission's statutory mission of satisfying the purposes of sentencing. Id. at 18-19.

In his conclusion, which really hit home in this case, Stabenow noted that:

The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History. As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images)." *See* Amendment 664 to United States Sentencing Guidelines, (November 1, 2004). The internet provides the typical means of obtaining child pornography, resulting in a two-level enhancement. *See* U.S.S.G. § 2G2.2(b)(6). Furthermore, as a result of internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase. *See* U.S.S.G. § 2G2.2(b)(7)(D). . . . Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring an additional six-level increase. *See* U.S.S.G. § 2G2.2(b)(2),(4). Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive a five-level enhancement for distribution of a thing of value. *See* U.S.S.G. § 2G2.2(b)(3)(B). Thus, an individual who swapped a single picture, and who was only engaged in viewing and receiving child pornography for a few hours, can quickly obtain an offense level of 40. Even after Acceptance of Responsibility, an individual with no prior criminal history can quickly reach a Guideline Range of 210-262 months, where the statutory maximum caps the sentence at 240 months. *See* U.S.S.G. § 5G1.1(a).

The results are illogical; Congress set the statutory range for first time distributors as five to twenty years. Congress could not have intended for the average first time offender with no prior criminal history to receive a sentence of 210 to 240 months. An individual with a Criminal History Category of II faces a Guideline range of 235 to 240 months, and any higher Criminal History score mandates the statutory maximum. These results run contrary not only to Congressional will, but also to a principal Guideline policy – providing harsher penalties to individuals with more significant Criminal History scores while still retaining an incentive for pleas at all Criminal History levels.

10

Id. at 22-23.[1]

The flaws identified by Stabenow were certainly evident in this case. An offender who appeared fairly typical, one with no prior record, found himself in a guideline range that exceeded the statutory maximum at the high end. I could not conclude that under the circumstances of this case, given all of the flaws in the guideline discussed above, that the range deserved deference. See also United States v. Grossman, 513 F.3d 592, 597-98 (6th Cir. 2008) (affirming a below-guideline sentence based in part on the district judge's conclusion that the multiple enhancements under the guidelines created a sentence greater than necessary); United States v. Baird, No. 8:07CR204, 2008 WL 151258 (D. Neb. Jan. 11, 2008) (giving the child pornography guideline less deference because it does not reflect the Commission's unique institutional strengths).

Second, the specifics of this case demonstrated that the range was far greater than necessary to protect the public and deter defendant from re-offending. See 18 U.S.C. § 3553(a)(2)(B) & (C). As Dr. Kotkin's letter indicated, defendant was invested in treatment and presented a low risk of re-offending. Dr. Kotkin concluded:

> Given the fact that Jon Hanson does not have a history of clearly illegal/anti-social activities and seems to have no intention of resuming any involvement of his previous pornographic obsessions, I do not believe he remains a significant threat for resumption of such activities and there remains no evidence of any intent or activity on his part that would involve any sexually inappropriate contact with any children. While legal guidelines may require a certain period of incarceration for Mr. Hanson, I believe that he certainly could be managed in the

---

[1] Of course, Stabenow is not the only commentator to note the flaws in this guideline. See also Mark Osler, Indirect Harms and Proportionality: The Upside-Down World of Federal Sentencing, 74 Miss. L.J. 1, 13 (Fall 2004) (noting that the guidelines "establish a harsher penalty for trafficking in virtual child pornography produced without the use of children (but indirectly posing the threat of harm to children) than they do for some actual sexual abuse of children by adults").

11

> community via continued therapy and supervision and, thus, begin to rebuild a solid, pro-social lifestyle for himself.

(Dr. Michael Kotkin, June 10, 2008 Letter Report at 3-4.) According to the evaluation completed by Dr. David Thompson, who administered various tests, defendant presented a low risk for future sexual offending. Dr. Thompson concluded:

> Jon Hanson is an individual who, according to his consistent reports, was the victim of early and frequent sexual abuse that involved masturbation and child pornography production and likely served as the basis for what has led to his current charges. Jon's early sexual experiences in that context likely taught him to be aroused to prepubescent images, and this pattern was further solidified through his masturbation to such images over the decades to follow. The antisociality component that would increase his risk of a future contact offense, however, has not been and is not present for him. His long history of stable employment, family life, and the absence of other offenses combined with his low risk scores on two predictor instruments all suggest that his risk of future sexual offending is low. One factor that could potentially increase his risk involves his alcoholism. Should Mr. Hanson return to abusing alcohol, his risk for reoffending would increase. Mr. Hanson's active participation in treatment over the past fourteen months, in combination with his active steps to eliminate his use of alcohol, together show that he is quite capable of effecting changes in his life. Continued treatment programming and continued abstinence from alcohol will be important for him in order to maintain his low risk of future offending.
>
> Based on all of the information available to this examiner, it is this examiner's opinion that Mr. Hanson is at low risk for future sexual offending.

(Dr. David Thompson, Forensic Evaluation at 7.)

The record demonstrated that, after his arrest, defendant made the significant, positive changes alluded to in the doctors' reports. In addition to the voluntary sex offender treatment, for which he paid out of pocket, he stopped drinking and attended AA regularly. He owned up to his conduct, admitted it to others, accepted responsibility and cooperated to the best of his ability in all phases of the case. I found his allocution at sentencing, as well as the supportive statement from his pastor, Steve Jennings, among the most insightful and moving I have heard in my time as a judge. It was clear from these statements that defendant fully understood the

12

wrongfulness of his conduct and was motivated to change. The letters from friends and family defendant submitted to the court also verified the changes. Given all of this, and the availability of lifetime monitoring on supervised release, I found a lesser prison sentence sufficient to protect the public. Finally, given the profound impact this prosecution had on him, and the fact that he had never before been to jail for even one day, I found a sentence at or near the minimum sufficient to deter him from re-offending. I also found that such a lengthy sentence was sufficient to deter others.

The statutory range set by Congress is 5 to 20 years. In order to acknowledge some of the aggravating factors in this case, such as number and type of images, and to insure just punishment, I did not impose a sentence at the minimum, as defendant requested. The minimum should be reserved for the most mitigated of cases. Under all of the circumstances, I found a sentence of 72 months sufficient but not greater than necessary.

**IV.**

Therefore, I committed defendant to the custody of the Bureau of Prisons for 72 months. In order to ensure the protection of the public and consistent with the guidelines' recommendation, see U.S.S.G. § 5D1.2(b)(2), I ordered defendant to further serve a supervised release term of life, with various special conditions, including alcohol and sex offender treatment, limitations on computer usage and contact with minors, and registration as a sex offender. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this 20th day of June, 2008.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

13